**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

PATIENCE OJO a/k/a PATRICIA OJO,

Plaintiff,

v.  　　　　　　　　　　CIVIL ACTION NO. _____
　　　　　　　　　　　　JURY TRIAL DEMAND

DEVEREAUX ADVANCED BEHAVIORAL HEALTH,
and KAHLEEF TAYLOR,

Defendants.

## COMPLAINT

### PRELIMINARY STATEMENT

1. This is a civil action for employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Plaintiff Patience Ojo brings this action against her former employer, Devereaux Advanced Behavioral Health, and her supervisor, Kahleef Taylor, seeking relief from unlawful retaliation that resulted in her wrongful termination after she reported workplace misconduct and financial irregularities.

### JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 2000e-5(f)(3), as this action arises under Title VII of the Civil Rights Act of 1964, as amended.
3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and Defendants reside and/or conduct business in this judicial district.
4. All conditions precedent to the filing of this action have been satisfied. Plaintiff timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on or about August 28, 2025. The EEOC assigned the charge number 530-2025-10384.
5. On September 29, 2025, the EEOC issued Plaintiff a Notice of Right to Sue.
6. This Complaint is filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue from the EEOC.

### PARTIES

7. Plaintiff Patience Ojo (referred to in some documents as "Patricia Ojo") is an adult individual who resides at 411 Trimble Boulevard, Brookhaven, Pennsylvania 19015. At

all relevant times, Plaintiff was an employee of Defendant Devereaux Advanced Behavioral Health.
8. Defendant Devereaux Advanced Behavioral Health ("Devereaux" or "the Company") is a behavioral health services organization with its principal place of business located at 139 Leopard Road, Berwyn, Pennsylvania 19312. At all relevant times, Devereaux employed more than fifteen (15) employees and was an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).
9. Defendant Kahleef Taylor is an adult individual who, at all relevant times, was the Administrator and/or supervisor at Devereaux's location at 139 Leopard Road (Adult Services), Berwyn, Pennsylvania 19312. Defendant Taylor is sued in his individual as well as official capacity.

## FACTUAL ALLEGATIONS

### Background Employment

10. Plaintiff Patience Ojo is a Black woman of Nigerian national origin, born on October 10, 1965.
11. Plaintiff was employed by Devereaux as a Mental Health/Mental Wellness Worker (MMHW) and later as a Supervisor.
12. In or around February 2025, Plaintiff resumed her position as Supervisor at Devereaux's Joseph Street location.
13. Throughout her employment, Plaintiff performed her duties competently and professionally, demonstrating initiative and responsibility in addressing client care and workplace concerns.

### Discovery of Financial Misconduct

14. When Plaintiff resumed her supervisory position at the Joseph Street location, she was not initially provided with the facility's Wegmans Card (a corporate purchasing card used for client and facility expenses).
15. Upon investigation, Plaintiff discovered that a staff member named Catherine had been using the Wegmans Card and was shopping online.
16. When Plaintiff attempted to review Catherine's purchases to reconcile accounts, Catherine responded with hostility.
17. Plaintiff properly reported this matter to her immediate supervisor, Kina (also referred to as "Ms. Kona" in the documents).
18. At the end of March 2025, Plaintiff requested receipts for all purchases made with the Wegmans Card to reconcile the balance sent to the facility. Catherine could not provide the receipts.
19. Plaintiff escalated this matter to the Accountant as required by proper protocol.
20. Loretta, the PRN (as-needed) Supervisor, later discovered that the Wegmans Card had been used to make unauthorized purchases at locations in New Jersey and Texas totaling nearly $1,000.

21. Plaintiff brought this financial misconduct to the attention of Vista, the accountant, who confirmed that the card had been used to make additional unauthorized purchases totaling approximately $1,000.
22. Plaintiff's report of this serious financial misconduct—totaling approximately $2,000 in misappropriated funds—constituted protected activity under Title VII and other employment laws.

### The Samantha Incident: Proper Reporting and Patient Advocacy

23. On or about June 5, 2025, Plaintiff received an email from staff at Melmark (another facility) stating that a client named Samantha had bruises on the upper side of her head.
24. This email reporting the client's injuries was also copied to Plaintiff's supervisor, Kina, and the nurse.
25. Immediately after reading this message, Plaintiff spoke with the staff member who had transported Samantha to Melmark regarding the bruises.
26. The staff member reported to Plaintiff that she had applied cream to Samantha's face that morning but did not observe any bruises or marks.
27. Plaintiff also followed up with the overnight shift staff, who similarly stated that they did not notice anything unusual on Samantha.
28. Apart from her professional responsibility, Plaintiff took her personal initiative to photograph Samantha's face and forwarded the photograph to her supervisor, Kina, along with a text message summarizing the concern raised by Melmark.
29. In response, Ms. Kona, Plaintiff's coordinator, advised that Plaintiff should instruct the staff to perform routine body checks before and after drop-offs.
30. Plaintiff immediately relayed this directive to the staff on duty and located the body check folder in the cupboard, which she showed to staff to ensure consistent use for daily check-ins and check-outs.
31. In addition, Plaintiff informed Samantha's mother of the incident and requested permission from her to take Samantha to urgent care, but the mother declined the request.
32. Plaintiff promptly notified the nurse of this development. The nurse informed Plaintiff that she had already ended her shift and advised Plaintiff to contact Nurse Kathy.
33. Nurse Kathy was contacted but was not available online, so Plaintiff left her a voicemail detailing the situation, including the mother's decision and Plaintiff's request for further instruction.
34. Unfortunately, Plaintiff did not receive a return call from Nurse Kathy.
35. It is important to note that Plaintiff was not informed directly by staff about the incident reported to Melmark. Plaintiff only became aware of the situation through the email that was also sent to her supervisor, Kina, and the nurse.
36. As a precautionary measure, Plaintiff instructed staff to continue closely monitoring Samantha and to contact her immediately if any situations demanded urgent attention.
37. Around midnight on Friday, staff informed Plaintiff that Samantha's condition had changed, and they transported her to urgent care.
38. After a full assessment and evaluation, the medical results showed no abnormalities.
39. Although Plaintiff was off duty at that time, she remained in communication with the staff to stay updated on Samantha's condition.

40. Later, Plaintiff shared the hospital results with Administrator Kahleef Taylor and Director Deborah Allen Hopkins.
41. On the day Plaintiff came to ask Director Hopkins for clarification about a call instructing her to stay home, and when she shared the result of the hospital outcome with Administrator K. Taylor, Plaintiff received a call at 7:00 PM from Ms. Kona instructing her to stay home.
42. Plaintiff's actions in the Samantha matter demonstrated exemplary patient advocacy, proper chain-of-command reporting, diligent follow-up, and responsible supervision—all protected activities under employment law.

43. Following Plaintiff's reports of financial misconduct involving the Wegmans Card, Defendant Kahleef Taylor and Ms. Kona began to treat Plaintiff with hostility and issued queries to Plaintiff for unjust causes.
44. This hostile treatment represented the genesis of Plaintiff's problems with Mr. Taylor and Ms. Kona.
45. Despite Plaintiff's proper handling of the Samantha incident, Defendant Taylor manufactured allegations of negligence against Plaintiff.

### Allegation 1: False Claims of Failure to Report Client Bruise

46. When the bruise on Samantha was first noticed, it was not reported to Plaintiff initially by her staff.
47. Rather, it was a staff member at Melmark—Karitha—who transported Samantha to the Program at Melmark and reported the matter to Melmark staff.
48. It was Melmark staff who sent an email to the nurse and copied Plaintiff and Kina (Plaintiff's Coordinator).
49. Neither Mr. Kahleef Taylor, Ms. Kona (Plaintiff's Coordinator), nor Loretta (the PRN Supervisor) took any action upon receiving the email from Melmark staff.
50. Plaintiff asked the staff members who worked the overnight and morning shifts with Samantha if they had noticed any bruises on her head, and they all responded negatively.
51. Plaintiff took the initiative to photograph the alleged bruise and send it to Samantha's mother for her awareness and review.
52. Plaintiff's proactive documentation and reporting exceeded her supervisory obligations and constituted protected activity.
53. The subsequent allegation that Plaintiff "failed to report" the client's bruise was factually false and pretextual, manufactured as retaliation for Plaintiff's earlier reports of financial misconduct.

### Allegation 2: False Claims Regarding EIM Documentation

54. Following Ms. Kona's directive, Plaintiff immediately implemented body check procedures and showed staff how to use the body check folder.
55. However, Plaintiff had not been properly trained on how to use the EIM (incident management system).
56. Plaintiff had only attended one EIM training session since resuming her position as Supervisor at Joseph Street in February 2025.

57. The month of May 2025 was Plaintiff's fourth month at Devereaux in her supervisory role.
58. Plaintiff informed the EIM trainer that she did not fully understand the system and was told the trainer would schedule a follow-up training, which never occurred.
59. Loretta, who was sent to support Plaintiff, never instructed Plaintiff on EIM documentation. Instead, Loretta focused on appointments, shift schedules, and medication reviews.
60. Despite this lack of proper training, Plaintiff reported the Samantha incident by: (a) contacting Samantha's mother and obtaining her response regarding medical care (which was initially declined); (b) instructing staff to monitor Samantha's condition and to transport her to Urgent Care if the condition worsened (which they did); (c) instructing staff to take photographs and provide updates to the Coordinator, Nurse, and Plaintiff herself because it occurred over the weekend.
61. Despite all of Plaintiff's efforts, neither Mr. Taylor, Ms. Kona, nor the Nurse visited the facility to assess the situation or provide support to Plaintiff.
62. The allegation that Plaintiff failed to properly document the incident in the EIM system was pretextual, as Plaintiff had not received adequate training and had made good-faith efforts to obtain such training.

### Allegation 3: False Claims of Failure to Follow Supervisor Recommendations

63. The claim that Plaintiff failed to follow supervisor recommendations is untrue.
64. Loretta was sent to the Joseph Street facility without prior notice to Plaintiff.
65. When Plaintiff contacted Ms. Kona about Loretta's assignment, Ms. Kona clarified that Loretta's responsibilities were limited to scheduling and calendar management using the Avatar system.
66. Loretta assisted with scheduling and calendar marking using Avatar, but she did not train Plaintiff on other procedures due to her busy schedule.
67. Plaintiff requested the template for scheduling and offered to learn independently if provided with written steps. As a Master's degree holder, Plaintiff was capable of self-training with proper documentation.
68. Loretta never followed up with the requested training materials.
69. Plaintiff reported the lack of training to Ms. Kona, who promised to address it but never did.

### The On-Call Scheduling Incident

70. Plaintiff also wishes to clarify an incident regarding her daughter's graduation from Syracuse University.
71. Plaintiff notified the scheduler, Melody, well in advance, explaining the situation and requesting a different on-call schedule to attend this important family event.
72. Melody never responded to Plaintiff's request, yet Plaintiff was later issued a written warning regarding the scheduling matter.
73. Plaintiff shared the email exchange with Melody and the subsequent warning with Director Deborah Allen Hopkins to demonstrate that she had properly communicated and sought approval in advance.

74. After Plaintiff was granted permission, she was nonetheless rescheduled for another on-call shift, which she attended.
75. This pattern of ignoring Plaintiff's reasonable requests and then disciplining her for the resulting conflicts constituted further evidence of retaliation.

**Termination**

76. On or about June 10, 2025, Plaintiff was terminated from her employment with Devereaux.
77. The stated reasons for Plaintiff's termination were the false and pretextual allegations described above.
78. Plaintiff's termination was in retaliation for her protected activities, including: (a) reporting financial misconduct involving approximately $2,000 in misappropriated corporate funds; (b) reporting workplace hostility when attempting to investigate the financial misconduct; (c) advocating for proper patient care and safety protocols; (d) requesting proper training and support; and (e) opposing what she reasonably believed to be unlawful employment practices.

**Protected Activity and Causal Connection**

79. Throughout the relevant time period, Plaintiff engaged in activity protected by Title VII, including: (a) reporting suspected financial misconduct and misappropriation of corporate funds; (b) complaining about hostile treatment from supervisors and coworkers when she attempted to investigate workplace misconduct; (c) advocating for proper patient care, safety, and documentation; (d) opposing what she reasonably believed to be improper and potentially unlawful employment practices.
80. Defendants were aware of Plaintiff's protected activities.
81. Following Plaintiff's protected activities, Defendants subjected Plaintiff to adverse employment actions, including: (a) hostile and unjust queries; (b) false allegations of performance deficiencies; (c) denial of adequate training and support; (d) disciplinary warnings for matters beyond Plaintiff's control or for which she had sought proper approval; and (e) ultimate termination of her employment.
82. There is a clear causal connection between Plaintiff's protected activities and the adverse actions taken against her.
83. The temporal proximity between Plaintiff's reports of financial misconduct (March 2025) and the beginning of hostile treatment, followed by the manufactured allegations regarding the Samantha incident (June 2025) and Plaintiff's subsequent termination (June 10, 2025), establishes a causal connection between the protected activity and the adverse actions.
84. Defendants' stated reasons for terminating Plaintiff were pretextual.
85. The allegations against Plaintiff were factually false, ignored her proper exercise of supervisory judgment and patient advocacy, and failed to account for Defendants' own failures to provide adequate training and support.

**Exhaustion of Administrative Remedies**

86. On or about August 28, 2025, Plaintiff filed a timely Charge of Discrimination with the EEOC, bearing Charge Number 530-2025-10384.
87. In her EEOC Charge, Plaintiff alleged retaliation in violation of Title VII.
88. On or about September 29, 2025, the EEOC issued Plaintiff a Notice of Right to Sue.
89. Plaintiff received the EEOC's Notice of Right to Sue on or about September 29, 2025.
90. This Complaint is filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue.
91. Plaintiff has exhausted all administrative remedies required under Title VII.

**Note Regarding Plaintiff's Name**

92. The EEOC Notice of Right to Sue and related documents mistakenly identify Plaintiff as "Patricia Ojo." Plaintiff's correct legal name is Patience Ojo. Any reference to "Patricia Ojo" in the EEOC documents refers to the same individual, Plaintiff Patience Ojo. This discrepancy does not affect the substance of Plaintiff's claims or the exhaustion of her administrative remedies.

## COUNT I: RETALIATION IN VIOLATION OF TITLE VII (Against All Defendants)

93. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.
94. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), makes it unlawful for an employer to discriminate against an employee because the employee has opposed any practice made unlawful by Title VII or has participated in an investigation, proceeding, or hearing under Title VII.
95. At all relevant times, Plaintiff was an employee within the meaning of Title VII, and Defendants were employers and/or agents of the employer within the meaning of Title VII.
96. Plaintiff engaged in protected activity under Title VII by: (a) reporting financial misconduct and misappropriation of corporate funds; (b) complaining about hostile treatment when investigating workplace misconduct; (c) advocating for proper patient care and workplace procedures; and (d) opposing what she reasonably believed to be unlawful employment practices.
97. Defendants were aware of Plaintiff's protected activities.
98. Defendants subjected Plaintiff to materially adverse employment actions, including hostile treatment, false allegations of performance deficiencies, denial of training and support, unjust disciplinary warnings, and ultimate termination of employment.
99. Defendants' adverse actions were taken because of, and in retaliation for, Plaintiff's protected activities.
100. There is a causal connection between Plaintiff's protected activities and the adverse employment actions taken against her, as demonstrated by the temporal proximity of events and the pretextual nature of Defendants' stated reasons for the adverse actions.
101. Defendants' conduct was intentional, willful, malicious, and in reckless disregard of Plaintiff's federally protected rights.

102. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered and continues to suffer damages, including but not limited to: (a) lost wages and employment benefits; (b) loss of future earnings and earning capacity; (c) emotional distress, humiliation, embarrassment, and mental anguish; (d) damage to professional reputation; and (e) other compensatory damages.
103. Defendants' conduct was undertaken with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Patience Ojo respectfully requests that this Court enter judgment in her favor and against Defendants, and grant the following relief:

A. A declaratory judgment that Defendants violated Title VII of the Civil Rights Act of 1964, as amended;

B. An award of compensatory damages for past and future pecuniary losses, including lost wages, lost benefits, and loss of earning capacity, in an amount to be determined at trial;

C. An award of compensatory damages for past and future non-pecuniary losses, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, in an amount to be determined at trial;

D. An award of punitive damages in an amount to be determined at trial;

E. Prejudgment and post-judgment interest as allowed by law;

F. An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k);

G. An order for such equitable relief as the Court deems appropriate, including reinstatement or front pay in lieu of reinstatement; and

H. Such other and further relief as this Court deems just and proper.

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

_____
CHRISTIAN C. NDUKA, ESQUIRE
Attorney for Plaintiff


Dated: December 4, 2025